ALLEN DWIGHT WOOD, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 30608

December 13, 1999

990 P.2d 786

*Michael K. Powell,* Carson City, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Noel S. Waters,* District Attorney, and *Anne M. Langer,* Deputy District Attorney, Carson City, for Respondent.

# OPINION

*Per Curiam:*

Appellant Allen Dwight Wood was sentenced to a minimum term of thirteen years in the Nevada State Prison after a jury conviction of one count each of attempted murder, solicitation to commit murder, and conspiracy to commit murder. Wood alleges numerous errors forming the basis of his appeal, including that the admission of out-of-court statements implicating him in the conspiracy was reversible error, that he was improperly convicted of solicitation to commit murder, and that Nevada's Fast Track criminal appeal procedure is unconstitutional. We conclude that appellant's rights under the Sixth Amendment were violated. We therefore reverse Wood's convictions for solicitation to commit murder, attempted murder, and conspiracy. Further, we hold that Nevada's Fast Track criminal appeal procedure is constitutional. We conclude that Wood's other contentions on appeal lack merit.

## FACTS

Wood and his ex-wife Lisa Wood resided in Carson City together during the fall of 1996. Wood and Lisa had a physical altercation on November 16, which resulted in Wood leaving the house. In the early morning hours of November 17, Lisa was asleep on a couch with her daughter and Louis Eads, a minor, when she awoke suddenly, in pain and bleeding profusely from her chin and neck. Two males, who were minors at the time, Justin Anderson and Brian Bardin, were standing near her. Anderson and Bardin knew Lisa through their association with Wood, who was allegedly the head of a "mafia organization" into which he had initiated the boys.

Initially, Lisa thought she had slashed her face on an upholstery nail. However, after talking to the boys she became suspicious that they had harmed her, and she forced them both out of her house.

As they were departing, Bardin told Lisa, "If you tell anybody, we won't miss the second time."

Anderson and Bardin were arrested for the assault on Lisa and were each charged as adults with attempted murder, battery with use of a deadly weapon and battery causing substantial bodily harm. Anderson and Bardin apparently fabricated a story that Wood, assisted by Eads and another minor, Chris Jones, entered the home and slashed Lisa. In exchange for their testimony against Wood, the State allowed Anderson and Bardin to plead guilty in juvenile court to a charge of conspiracy to commit battery. The State gave Anderson and Bardin immunity for the adult charges, which were dismissed. Several days before the plea agreement with Anderson and Bardin was negotiated, the State charged Wood with attempted murder, battery with use of a deadly weapon, and battery causing substantial bodily harm.

At Wood's preliminary hearing, Anderson and Bardin both testified that on November 16, Wood instructed them to leave Lisa's home unlocked around 4:30 a.m. on November 17, so that he could enter the home and murder Lisa. Eads testified that he saw Wood injure Lisa with a knife. Jones testified that Wood told him that he had injured Lisa. After the preliminary hearing, Wood was bound over for trial on attempted murder, battery with use of a deadly weapon, and battery causing substantial bodily harm.

After the hearing, the State received information that Anderson and Bardin had admitted that they assaulted Lisa. Thereafter, a second preliminary hearing was held for Wood, and Anderson testified that he had perjured himself at the initial preliminary hearing. Anderson then admitted that he and Bardin went to the home at Wood's insistence, and that Wood instructed Anderson to murder Lisa while Bardin murdered Eads. The State continued Anderson's immunity from the adult charges, and granted him immunity for his perjured testimony at the first preliminary hearing.[1]

At the second preliminary hearing, Eads denied seeing Wood slash Lisa and instead claimed to have witnessed Bardin commit the attack. Eads was also granted immunity for his perjury at the first preliminary hearing. On the basis of Eads's and Anderson's testimony at the second preliminary hearing, Wood was bound over on the original three counts which had been amended to allege vicarious liability as a non-participating aider and abetter. He was also bound over on a charge of conspiracy to commit murder and solicitation to commit murder.

---

[1]Bardin refused to recant the statements he made during the first preliminary hearing, and the State withdrew his immunity. The State prosecuted Bardin as an adult, and he pled guilty to battery with use of a deadly weapon, receiving a sentence of 24-60 months incarceration.

Wood's case proceeded to trial, with the State's theory being that Wood solicited Anderson and Bardin, and then conspired with them, to kill Lisa. Anderson testified at the trial that after the November 16 fight between Lisa and Wood, Wood met with Bardin and Anderson twice in Bardin's garage to discuss killing Lisa and Eads. To corroborate Anderson's testimony, the State called Amanda Greene, who testified that Bardin told her prior to November 16, that he and Anderson were going to kill Lisa at Wood's request. Anderson also testified that while he assaulted Lisa, he never intended to harm her.

After a five-day jury trial the jury convicted Wood of attempted murder, conspiracy to commit murder, and solicitation to commit murder. Wood received consecutive sentences that resulted in a minimum term of thirteen years in prison. Wood filed this timely appeal, which was initially placed on the Fast Track system pursuant to NRAP 3C. After Fast Track statements were filed, the case was moved to the fully-briefed track.

## DISCUSSION

### Hearsay Statements of Co-Conspirator

Wood contends that the trial court's admission of statements Bardin made to Amanda Greene violated the Confrontation Clause of the Sixth Amendment. We agree. This court has held that:

> The Confrontation Clause limits the state's ability to use hearsay as evidence in criminal trials when the hearsay declarant does not testify. The Clause requires that hearsay offered against an accused be sufficiently reliable to substitute for in-court scrutiny through cross-examination. Hearsay statements are sufficiently reliable when they fall within a "firmly rooted" hearsay exception.

Franco v. State, 109 Nev. 1229, 1239, 866 P.2d 247, 253 (1993) (footnote omitted). If the hearsay statements do not fall within such an exception, they must be supported by a showing of "particularized guarantees of trustworthiness." Id. at 1239, 866 P.2d at 254. Greene's testimony does not qualify as non-hearsay, does not fall within any exception to the hearsay rule, and was not supported by particularized guarantees of trustworthiness.

Greene testified that Bardin told her that Wood had asked him to kill Lisa, and that Bardin said that he had decided that he and Anderson were going to comply with Wood's request. The district

court admitted the statement as non-hearsay under NRS 51.035(3)(e), which provides:

> 3.  The statement is offered against a party and is:
>
> . . .
>
> (e) A statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

This court has held that before an out-of-court statement by an alleged co-conspirator may be admitted into evidence against a defendant, the existence of a conspiracy must be established by independent evidence, and the statement must have been made during the course of and in furtherance of the conspiracy. Carr v. State, 96 Nev. 238, 239, 607 P.2d 114, 116 (1980).

Independent evidence of a conspiracy to kill Lisa was admitted. Anderson testified that Wood asked him to kill Lisa and provided him with a knife, which was not used in the attack, to perpetrate the crime. Corroborating Anderson's testimony and Bardin's admission, Rich Hussey testified that after the attack, he heard Bardin tell Wood that Bardin "[did] not cut her face right," and Wood did not respond in a manner suggesting that he was unaware of what Bardin was talking about. Further, Jones testified that on the night Lisa was slashed, Wood said that he wanted to "kill that fucking bitch," and that while Jones was unsure if Wood was serious about actually killing her, Wood sounded "sincere." No motive was apparent for the boys to slash Lisa independent of Wood's request that they do so.

However, Bardin's statement to Greene was not made in furtherance of the conspiracy, as is required under NRS 51.035(3)(e). In U.S. v. Shores, 33 F.3d 438, 444 (4th Cir. 1994), the United States Court of Appeals for the Fourth Circuit held that statements made by a co-conspirator to a third party who is not then a member of the conspiracy are in furtherance of the conspiracy only if they are designed to induce that party to join the conspiracy or act in a way that would assist the conspiracy's objectives. Neither of these factors is present in Bardin's statements to Greene. Therefore, we conclude that the statement could not be admitted under NRS 51.035(3)(e) as non-hearsay.

Furthermore, the statement does not fall within any firmly rooted exception to the hearsay rule. The statement does not qualify as a statement against interest under NRS 51.345. NRS 51.345(2) provides "[t]his section does not make admissible a statement or confession offered against the accused made by a codefendant or other person implicating both himself and the accused." The statement was offered against Wood and was made

by Bardin, and implicated both Wood and Bardin, disqualifying it for the hearsay exception under the statute.

Thus, we must determine if Greene's testimony is supported by a showing of particularized guarantees of trustworthiness. Bardin implicated himself in the conspiracy via his statement to Greene, which suggests that the statement is trustworthy because it was against Bardin's interests. However, Bardin then testified at the first preliminary hearing that Wood assaulted Lisa, contradicting his statement to Greene that he was planning to kill Lisa pursuant to Wood's order. Bardin refused to recant this testimony. There was nothing in the circumstances surrounding Bardin's statement to Greene that provides a particularized guarantee of trustworthiness as required for admission under the Confrontation Clause. *Franco*, 109 Nev. at 1239, 866 P.2d at 253. Adequate indicia of reliability must be found in reference to circumstances surrounding the making of the out-of-court statement, and not from subsequent corroboration of the criminal act. Idaho v. Wright, 497 U.S. 805, 821 (1990). There are no such indicia of reliability here and therefore, the admission of Greene's testimony was erroneous.

Both hearsay and Confrontation Clause errors are subject to harmless error analysis. *Franco*, 109 Nev. at 1237, 866 P.2d at 252. Wood's conviction rested almost exclusively on the testimony of Anderson, a co-conspirator who admittedly previously perjured himself. Bardin's statement, also implicating Wood, could very well have been the deciding factor for the finding of guilt by the jury. Therefore, we cannot conclude that the erroneous admission of Bardin's statement via Greene's testimony was harmless beyond a reasonable doubt.

*Solicitation to Commit Murder*

Wood maintains that he was improperly convicted of solicitation to commit murder under NRS 199.500(2). We agree that if Wood is convicted of conspiracy to commit murder or attempted murder, he cannot be convicted of solicitation to commit murder for the same acts. The statute provides:

> A person who counsels, hires, commands or otherwise solicits another to commit murder, *if no criminal act is committed as a result of the solicitation,* is guilty of a category B felony and shall be punished by imprisonment in the state prison for a minimum term of not less than 2 years and a

maximum term of not more than 15 years, and may be further punished by a fine of not more than $10,000.

(Emphasis added.)

When a person solicits another to commit murder and the second person agrees, a conspiracy is formed. NRS 199.480(1) governs conspiracy and provides in pertinent part:

> [W]henever two or more persons conspire to commit murder . . . each person is guilty of a category B felony. . . .

A conspiracy is a criminal act, which triggers the exclusionary clause in the solicitation statute. In State v. Koseck, 113 Nev. 477, 479, 936 P.2d 836, 837 (1997), we held that, "[w]hen a defendant receives multiple convictions based on a single act, this court will reverse 'redundant convictions that do not comport with legislative intent.' " (Citation omitted.) Based on the exclusionary language contained in NRS 199.500(2), on remand, Wood could be convicted of solicitation to commit murder in these circumstances only if he is not convicted of conspiracy or attempted murder for the attack on Lisa.

*Fast Track Procedure*

Wood also maintains that Rule 3C of the Nevada Rules of Appellate Procedure (NRAP), governing Fast Track criminal appeals, violates both NRS 2.120(2), which prohibits this court from making rules that abridge or modify a substantive right, and Article 6, Section 4 of the Nevada Constitution, which guarantees a right of appeal in felony cases. Wood argues that all defendants who have elected to stand trial are granted an unrestricted right to a fully-briefed appeal without having to make a preliminary showing of merit. We disagree. The United States Supreme Court has determined that the pertinent Fourteenth Amendment issue regarding criminal appeals is whether criminal defendants have an adequate opportunity to present their claims within the adversary system. Ross v. Moffitt, 417 U.S. 600, 612 (1974). Nothing in the Nevada Constitution or NRS 2.120(2) requires a more stringent standard.

Under NRAP 3C(d) trial counsel has the right to order a rough draft transcript of the trial proceedings, in addition to filing a Fast Track statement pursuant to NRAP 3C(e). Thus, under Nevada's Fast Track system, defendants are afforded the opportunity to review the lower court proceedings before presenting their claims to this court. Further, NRAP 3C(k) provides for written presentation of the arguments on appeal and a conference with one jus-

tice if this court determines it is necessary. Since the expansion of the Supreme Court and the Court deciding most cases by sitting in three-justice panels, referral to a panel has replaced the one-justice conference. A case that presents a substantial, substantive issue and is not susceptible to a quick disposition, as the case at hand, is referred to the full court for decision.

Other states have implemented expedited criminal appellate systems. The State of New Mexico employs a summary calendar system for criminal appeals. Unlike Nevada, this system does not provide for the filing of a transcript before the appeal and allows no oral argument. *See* New Mexico Rules of Appellate Procedure 12-210(D)(1), (4). In State v. Ibarra, 864 P.2d 302, 304-05 (N.M. Ct. App. 1993), *cert. denied,* 513 U.S. 1157 (1995), the New Mexico Court of Appeals held that even the lack of access to a trial transcript did not violate defendants' due process rights as long as defendants were able to properly present issues raised on appeal.

The only expedited criminal appeal system that has been held to violate defendants' due process rights was in New Hampshire. In Bundy v. Wilson, 815 F.2d 125, 127 (1st Cir. 1987), the United States Court of Appeals for the First Circuit considered the New Hampshire Supreme Court's discretionary practice of issuing a "declination of acceptance order," which disposed of criminal defendants' appeals without any indication regarding the court's views on the merits. The notice of appeal, on which the court based its declination of acceptance order, normally was not accompanied by a transcript of the proceedings below. *Id.* The First Circuit held that the court's practice violated defendants' due process rights because it disposed of their appeals without giving them a transcript or an opportunity to persuade the court to accept their appeals. *Id.* at 135. Nevada's Fast Track system does not suffer from either of these defects. There is an automatic right of appeal, a transcript is provided, and the substantive arguments are considered by the court, albeit on shorter briefs.

We hold that Nevada's Fast Track system complies with the due process requirements of the United States Constitution, the Nevada Constitution, and NRS 2.120.

## CONCLUSION

We reverse the judgment of conviction of attempted murder, solicitation to commit murder, and conspiracy, and remand this case to the district court for further proceedings consistent with this opinion.

MAUPIN, J., concurring in part and dissenting in part:
I would affirm Wood's convictions for attempted murder and

conspiracy. Because I agree that Wood could only be convicted of solicitation to commit murder in the absence of a conviction for conspiracy arising from the alleged solicitation, the conviction for solicitation would have to be vacated under my analysis. I also agree that our fast track program does not violate either the U.S. or the Nevada Constitutions.

I agree that Bardin's statements introduced through Amanda Greene do not qualify as non-hearsay per NRS 51.035(3)(e), and are not subject to any recognized hearsay exception. However, while the various statements of Bardin and Anderson relative to these proceedings are subject to serious credibility attacks, the admission of Amanda Greene's testimony, in my view, amounts to harmless error.

First, the victim's testimony is that Bardin and Anderson were her assailants. Thus, it must be conceded that both have lied about many of the details of the assault and the plans made in aid of it. Second, the victim and Wood had lived together until one day prior to the assault and the separation was precipitated by a physical altercation between the two. Thus, a clear motive for the assault was established. Third, Rich Hussey, Wood's friend and roommate on the night of the assault, overheard Bardin tell Wood after the attack that he had partially failed in his mission. Further, Wood's response was not that of a person who seemed unaware of an attempt to kill his estranged wife, ''[w]ell we'll deal with this in the morning and [sic] just go to sleep.''

It must be conceded that almost all of the witnesses to this sub-cultural affair have lied in some important respect. This is to be expected in this type of case. Notwithstanding these fabrications, I conclude that there was overwhelming evidence not subject to credibility questions, which supports the convictions of Wood for conspiracy to commit murder and attempted murder.